Parks Engineering, Inc., Appellant, vs. Wisconsin Steel Treating & Blasting Company, Respondent.

*November 9—December 4, 1956.*

For the appellant there was a brief by *Affeldt & Lichtsinn,* and oral argument by *Eldred Dede,* all of Milwaukee.

For the respondent there was a brief and oral argument by *Martin J. Price* of Milwaukee.

FAIRCHILD, C. J.   In the thorough study of the testimony made in judging the evidence by the learned trial judge, he pointed out that the practical point in determining the controversy is the condition of the rods when delivered by the defendant to the plaintiff. The burden of proof to show that they were then defective is, of course, on the plaintiff, and the ruling of the trial court is not to be disturbed unless it is against the great weight and clear preponderance of the evidence. *Winslow v. Winslow,* 257 Wis. 393, 43 N. W. (2d) 496; *Rosen v. Ihler,* 267 Wis. 220, 64 N. W. (2d) 845; *Herzing v. Hess,* 263 Wis. 617, 58 N. W. (2d) 430. In the effort on the part of the litigants to determine the point of responsibility, expert metallurgists were called by each

party to assist the court. As usual in a study of this character, there is a mixture of possibilities and probabilities, but the evidence supports the findings of fact and requires denial of plaintiff's claim for damages.

The rods manufactured by the plaintiff, in order to serve their purpose as connecting rods, are so fashioned that a cap end is of prime importance in a heating process. The plaintiff secured metal and made a rough forging. A portion of a rod was painted with a heat-resistant compound and then turned over to the defendants for the heating treatment required to perfect the rod for its use. An expert metallurgist testified, in substance, that "The Rockwell machine tests the hardness. . . . The customer can check these rods then, to see if they are the required hardness with a Rockwell machine." The evidence is to the effect that the heat-treating was done by competent men, according to accepted methods, and that the 10 per cent test disclosed no defective rods. The defendants and the plaintiffs had dealt with each other for about eight years with no serious difficulties.

With reference to the delivery of the rods by the defendant to the plaintiff, the testimony of witness Lowe is to the effect that the customer "can check these rods then to see if they are the required hardness with a Rockwell machine." It is after the delivery of the rods to the plaintiff that the grinding or machining operations occurred. This witness further testified: "There are various ways of telling whether or not a rod is the required hardness. You can tell it by grinding, by machining, a machining tool wouldn't touch a hardened surface, and you can tell it by various hardness-testing machines. I think the average grinder could tell it; the average machinist could. Supposing that a rod had the required hardness of 60–64 Rockwell, with a case of .030–.035. Improper grinding could remove that case and reduce the hardness." He further testified that "The exhibits presented by the plaintiff were injured by grinding." There was further testimony

by other metallurgists supporting the testimony just referred to.

The obligations assumed by the defendant were as set forth in the statement of facts. Under the contract, on and between May 5, 1952, and May 13, 1952, plaintiff delivered to defendant rods to be heated, carburized to a case depth of .030–.035, and hardened to test Rockwell C 60–64. It is established that from time to time, between May 6, 1952, and May 22, 1952, the defendant made deliveries of heat-treated rods to the plaintiff, who thereafter performed grinding and finishing operations thereon. No complaint was made of the efficiency of the heat-treatment and the carburizing until after the rods had been ground and delivered to the plaintiff's customer, and then tests were made by the plaintiff of the 1,171 of said rods which were found defective and were in such condition that they could not be reheat-treated and refinished to proper specifications and were not salvageable or useful for any purpose. Immediately upon notification of the result of the tests, plaintiff notified defendant and attempted to return the rods. The offer was rejected by the defendant. The trial court in its opinion said: "Plaintiff has had rods heat-treated by the defendant in great numbers for about eight years with no serious difficulties. . . . After the heat-treating, the rods were returned to the plaintiff, who then proceeded to manufacture the rod. This included grinding off parts of the case with a grinding machine operated by employees of the plaintiff working on an incentive plan."

It also appears from the evidence that the plaintiff put his metallurgist in the defendant's plant, and the court found that defendant followed the directions of the metallurgist in testing batches of rods in accordance with the agreement. The instructions were complied with by the defendant with reference to the stipulation of the test of one in ten. The record discloses that the negotiations with relation to the price of the testing covered this feature of the contract. The defend-

ant's price quoted was about 10 cents per rod for testing one in ten, and about 19 cents per rod for a 100 per cent inspection. The plaintiff chose the cheaper method.

It appears also that all of the defendant's employees who worked on these rods were experienced, competent men, and that the defendant had proper testing machinery. The testing plan was carried out, and the evidence is that there was a sufficient testing in the opinion of the contracting parties. The testimony is that the grinding process to complete the rods was performed by the plaintiff. The witness Lowe testified that: "These various rods are right in front of me now. I didn't test them outside of court. I am seeing them for the first time in court. I have the figures that Mr. Bartelt [plaintiff's metallurgist] arrived at on the front of each instrument. And were I to break them down and count them, we presume that those figures are the figures. Based on the testimony in the record of Mr. Bartelt that these are the readings that he gets on these various rods, there are various exhibit numbers. . . . In my opinion, in all these cases it is caused by the grinding. In my opinion that was caused by the grinding, and I base that conclusion upon Mr. Bartelt's hardness readings. The differential in the readings leads me to the conclusion that the softness was caused by the grinding."

There is ample evidence of the above character on which the trial court reached the conclusion that the defendant followed the usually accepted method in heat-treating the rods intrusted it by plaintiff, that it made the 10 per cent check, and that there was no evidence that any rods lacked sufficient hardness at the time of their delivery to the plaintiff. It is also the testimony of the witness Parks that a 10 per cent check properly made should have revealed any defective condition of the rods.

From the testimony in the record as submitted, it is considered that the trial court ruled correctly in directing the judgment it did. The claim of damages to the extent of

$11,200 for loss of profit is not treated here because there is no contention upon this appeal that the plaintiff is entitled to it.

*By the Court.*—Judgment affirmed.